UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-CR-0106-CVE |
| | ) | |
| ANTHONY DRAKE AHAISSE, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

On August 4, 2020, a grand jury returned an indictment charging defendant with three counts: murder in the first degree in Indian country, in violation of 18 U.S.C. §§ 1151, 1153, and 1111; carrying, brandishing, using, and discharging a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii); and being a felon in possession of firearms and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Dkt. # 14. Now before the Court is defendant's motion to suppress (Dkt. # 30), and plaintiff's response thereto (Dkt. # 34).

In his motion to suppress (Dkt. # 30), defendant argues that the firearms and ammunition extracted from the front cabin of his truck after he was taken into custody by law enforcement were obtained pursuant to an unconstitutional search, in violation of his Fourth Amendment rights. Defendant argues that the Tulsa Police Department's (TPD's) search was unlawful because defendant was approximately 100 feet from his vehicle–and thus not within reach of his vehicle or its contents–when he was arrested. Dkt. # 30, at 1-2. Defendant argues that, as a result, the search of his vehicle was not a proper search incident to arrest and so the recovered evidence should be suppressed.

In its response (Dkt. # 34), plaintiff argues that the evidence should not be suppressed for several reasons. Plaintiff states that the firearms and ammunition were cleared after a high-speed chase after which defendant was taken into custody. Accordingly, plaintiff argues that the firearms and ammunition were not seized in violation of the Fourth Amendment but rather, they were discovered and inventoried as a community caretaking function after defendant was arrested, or alternatively, they were seized pursuant to a protective sweep.

Second, plaintiff argues that, even if a Fourth Amendment violation did occur, the exclusionary rule should not bar the introduction of the evidence recovered from defendant's vehicle because its discovery was inevitable. Plaintiff contends that the firearms and ammunition would have been found either during an inventory search before the truck's impoundment, or during a probable cause search related to the murder investigation.

The Court conducted an evidentiary hearing on this motion on June 3, 2021 at which it heard testimony from TPD Captain Jerrod Hart. The Court also received into evidence plaintiff's exhibits 1-4,[1] without objection. After reviewing the briefs, the evidence, and the arguments presented, the Court finds that the car was lawfully impounded after defendant was taken into custody. Because the evidence defendant seeks to suppress would have been inventoried regardless of whether the community caretaking function or protective sweep exceptions apply, the evidence is admissible under the inevitable disclosure doctrine.

---

[1] The exhibits are: TPD Procedure 31-112G (exhibit 1); TPD Procedure 31-112H (exhibit 2); a TPD tow-in Report, dated March 23, 2019 (exhibit 3); and a TPD property receipt, dated March 23, 2019 (exhibit 4).

I.

At the hearing, TPD Captain Hart testified on direct examination that he is familiar with TPD Procedure 31-112G (plaintiff's exhibit 1), and explained that it authorizes TPD to tow or remove vehicles from roadways in certain instances. He stated that there are several reasons that TPD is authorized to tow a vehicle, specifically noting it would be appropriate to tow a vehicle following an arrest, or if the vehicle were a traffic hazard for other vehicles on the roadway. He testified that he is also familiar with TPD Procedure 31-112H (plaintiff's exhibit 2), which details the TPD's procedure for conducting an inventory of a vehicle prior to the vehicle being impounded. Hart testified that, pursuant to that policy, contraband and evidence are supposed to be turned into the TPD property room.

As to the evening of March 23, 2019, Hart stated that he was leaving his second job providing security to teams at the NCAA basketball tournament, and that he was dressed in his uniform. As he was driving on the highway, he observed a car he estimated was traveling at about 100 mph in the far right lane. He stated that that vehicle was driving in a manner that caused other vehicles to swerve into other lanes to avoid it. Hart stated he tried to catch up to the vehicle, and activated his lights and sirens. The vehicle started to slow down and pull over from the middle lane into the right lane; however, suddenly, the vehicle began to accelerate and maneuver between two cars in the middle lane. This caused another vehicle to swerve to avoid a collision. The vehicle Hart was pursuing sped up to over 100 mph, and Hart continued to follow the vehicle. Then vehicle abruptly slowed down, at which point Hart was able to narrowly avoid collision with the rear of the vehicle. Then the vehicle again accelerated to over 100 mph.

The vehicle then exited the highway and pulled into a QuikTrip parking lot. Hart followed the vehicle into the parking lot and the two vehicles circled the lot. Hart testified that he believed that defendant was trying to gain a tactical advantage by getting behind Hart's vehicle. To avoid that, Hart backed up against the building as the other vehicle continued to drive around the parking lot. Thereafter, the vehicle exited the parking lot and proceeded to pull over and stop in a dark area by the side of a road. Hart did not approach; instead, he called officers already en route to the scene in order to organize a tactical takedown of the vehicle. Hart testified that other officers lined up their cars across the street to block the roadway. Then officers used the loudspeaker system and attempted to communicate directions to the driver of the vehicle. Hart testified that, at that time, the radio in the other vehicle was turned up, presumably to drown out the officers' instructions.

At that point, Hart said, the officers decided to deploy two bean bag rounds to the rear window of the vehicle to get the attention of the driver. The bean bag rounds damaged the rear window of the vehicle. After that, the driver put his hands out of the vehicle and complied with the officers' instructions.[2] He was taken into custody and handcuffed.

Hart testified that the officers next "challenged the vehicle" in an attempt to ascertain whether anyone else was inside. There was no response. Thereafter, officers walked up to the vehicle and began to "clear it." Hart stated this was to ensure that there were no other parties in the car, either hostile or hostage. Hart further testified that, because he knew the vehicle would be towed, he had to ensure that there was nothing dangerous in the vehicle.

---

[2] Defendant states, and no evidence contradicts, that defendant was instructed to exit his vehicle and walk backwards away from the vehicle prior to being taken into custody by TPD officers.

Hart stated he believed that the driver had left the driver-side door open when he exited the car prior to his arrest, but Hart also testified that officers did open doors of the vehicle. Hart explained that, when looking in the vehicle, he observed a handgun on the floorboard under the driver's seat and a shotgun laying across the middle console and passenger-side of the vehicle.

Hart testified that, after the TPD officers ensured that there were no other people in the vehicle, he went to check the license plate number in the system. He then received a call from another TPD officer and learned that the driver was potentially a suspect in the murder of Gregory Collins, who had been fatally shot earlier that day. Thereafter, Hart stated that he directed officers to take precautions to preserve any potential evidence. Hart stated the officers were told to mark the car with "no touch" instructions, in order to alert the towing company that the vehicle should be placed in a secure area and that it should not be opened prior to the arrival of TPD detectives.

Hart stated that, prior to having the vehicle towed, the firearms and ammunition were removed because they were potentially evidence in a murder case. He explained that, pursuant to TPD policy, any potential evidence recovered from a vehicle would be turned into a property room, put on a property receipt, and given a property number. He indicated that plaintiff's exhibit 4 was the property receipt associated with the driver's vehicle and on the night in question. Hart then proceeded to identify the defendant as the driver of the vehicle that attempted to elude him the evening of March 23, 2019.

On cross examination, defense counsel asked Hart whether defendant had been charged with a DUI that night, which Hart could not recall. Defense counsel asked about the inventory of defendant's vehicle, referencing the tow-in report (exhibit 3) specifically. Hart explained that typically that was the sheet used to inventory a vehicle. In a typical case the officers would list all

items over $20 on the inventory sheet if they were going to leave the items in the vehicle. But, he noted that, because the officers were pulling evidence from the vehicle, a property receipt (exhibit 4) was used to inventory the vehicle's contents instead. He also stated that the offiers would not leave firearms in a vehicle regardless of the circumstance, so in any instance a firearm would have been turned in to the property room for the owner to retrieve.

Defense counsel then asked whether, during Hart's pursuit of defendant, Hart had ever observed who was in the vehicle. Hart stated he could see defendant while he was driving in the QuikTrip parking lot as that area was very well-lit. However, Hart could not ascertain whether anyone else was in the vehicle. He also stated that there were blinders in the back seat obscuring his view of the back of the car. Defense counsel then asked whether Hart had observed any facts that would lead him to believe defendant had committed any crimes, other than those observed, at the time of his arrest. Hart said he was not aware at the time of the arrest of the events that had occurred across town.

## II.

The Fourth Amendment guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures." U.S. CONST. amend. IV. "Reasonableness under the Fourth Amendment 'depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" United States v. King, 990 F.2d 1552, 1559 (10th Cir. 1993) (quoting United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975)). However, "[o]ne has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. . . . A car has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and its contents

are in plain view." South Dakota v. Opperman, 428 U.S. 364, 368 (1976) (quoting Cardwell v. Lewis, 417 U.S. 583, 590 (1974)).

"In the interests of public safety and as part of what the Court has called 'community caretaking functions,' automobiles are frequently taken into police custody." Id. (quoting Cady v. Dombrowski, 413 U.S. 433, 441 (1973)). "To permit the uninterrupted flow of traffic and in some circumstances to preserve evidence, disabled or damaged vehicles will often be removed from the highways or streets at the behest of police engaged solely in caretaking and traffic-control activities." Id. Additionally, vehicles are often lawfully impounded after officers witness the commission of crimes in their presence, especially where the suspect is subsequently apprehended. Bennett v. State, 507 P.2d 1252, 1254 (Okla. Crim. App. 1973). "The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." Opperman, 428 U.S. at 369.

"When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles' contents. These procedures developed in response to three distinct needs: the protection of the owner's property while it remains in police custody; the protection of the police against claims or disputes over lost or stolen property; and the protection of the police from potential danger." Id. (internal citations omitted). "These caretaking procedures have almost uniformly been upheld by the state courts, which by virtue of the localized nature of traffic regulation have had considerable occasion to deal with the issue." Id.; see also Bennett, 507 P.2d at 1254. Federal courts of appeals have also "sustained inventory procedures as reasonable police intrusions." Opperman, 428 U.S. at 371. This is especially so, where "[t]here is no suggestion whatever that this standard procedure, essentially like that followed throughout the country, [is] a

pretext concealing an investigatory police motive." Id. at 376.  In fact, the Supreme Court has held that "[i]t would be unreasonable to hold that the police, having to retain the car in their custody for such a length of time, had no right, even for their own protection, to search it." Id. at 373 (quoting Cooper v. California, 386 U.S. 58, 87 (1967)).

Further, "[i]f evidence seized unlawfully would have been inevitably discovered in a subsequent inventory search, such evidence [is] admissible." United States v. Tueller, 349 F.3d 1239, 1243 (10th Cir. 2003) (quoting United States v. Ibarra, 955 F.2d 1405, 1410 (10th Cir.1992)). "The inevitable discovery doctrine provides an exception to the exclusionary rule and permits evidence to be admitted if an independent, lawful police investigation inevitably would have discovered it." United States v. Cunningham, 413 F.3d 1199, 1203 (10th Cir. 2005) (internal citation and quotation marks omitted). The government must show, "by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation." Id. "To prove the seized evidence would have been inevitably discovered, the government can rely on a hypothetical inventory search, but only if such a search would not have transgressed its administrative purposes." United States v. Martinez, 512 F.3d 1268, 1274 (10th Cir. 2018). However, "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." Florida v. Wells, 495 U.S. 1, 4 (1990).

### III.

In this case, plaintiff argues that law enforcement was acting in its community caretaking capacity when it initially cleared the car of the firearms and ammunition once defendant had been arrested after a high speed chase.  At that time, plaintiff asserts that law enforcement had ample probable cause to effectuate an arrest based on a violation of Okla. Stat. tit. 21, § 540A, eluding a

peace officer. Plaintiff further argues that, at the time of the arrest, no one was in the vehicle who could take possession of it. As a result, plaintiff maintains that it was acting in its community caretaking function when it inventoried the vehicle and had it towed after the arrest, as it was unattended and had been breached by bean bag rounds fired into the back windshield earlier. The Court does not address whether the police were acting pursuant to a valid community caretaking function by "clearing" the vehicle after defendant was taken into custody, as the Court finds law enforcement was within its rights to impound and inventory the vehicle for two reasons, leading to the inevitable disclosure of the firearms and ammunition located in plain view in the interior of the vehicle.

In this case, the evidence is admissible as it would have been discovered, regardless of whether TPD officers cleared the firearms and ammunition as a community caretaking function or pursuant to a protective sweep, because two TPD procedures mandated the inventory of the vehicle's contents. Captain Hart's testimony shows that defendant was taken into custody after he had eluded peace officers, and those same officers had also observed other unlawful behavior (e.g., speeding and erratic driving). Defendant states, and plaintiff does not appear to dispute, that defendant was taken into custody when he was out of reach of the vehicle. However, while defendant was in custody and still at the scene, Hart received information that defendant was a potential suspect in a murder that had occurred earlier that day. Therefore, at that point TPD procedure dictated that the vehicle be impounded. See Dkt. # 34-1, at 1 (TPD Procedure 31-112G states that officers may impound vehicles where a "vehicle is evidence in a crime or needs to be held for investigatory purposes."). TPD Procedure 31-112G states that "[o]fficers shall conduct an inventory of all impounded vehicles prior to the vehicle being towed to the storage facility." Id. at 5. As a result, even in the event that

defendant had closed the door behind him and left the car in a legal parking space, the officers would have impounded the car pursuant to the TPD policies regarding potential criminal activity relating to defendant, and therefore would have been required to inventory it.

In this case, however, the vehicle was not parked in a legal space. Hart testified that the vehicle was pulled over on the side of the road, and evidence indicates it had been damaged by the bean bag rounds (see plaintiff's exhibit 3, stating there was rear window damage). TPD officers may impound vehicles if "the driver is arrested and the vehicle is left unattended in a location that would constitute a traffic hazard or is highly susceptible to damage or vandalism." Id. at 1. Hart's testimony reveals that the car was on the side of a dimly-lit road, and defendant had been arrested for eluding peace officers. Therefore, TPD officers had a second rationale for the removal and subsequent inventory of the vehicle–the removal of the vehicle for the public safety and to prevent further damage or vandalism to the vehicle. This removal would have been prudent principally because the car was not in a legal parking space and defendant was in custody. Additionally, the inventory and towing of the car was reasonable because, due to the damage caused by the bean bag rounds, the vehicle was susceptible to a break-in.

Given these facts, the Court finds that TPD officers, who were "following standard police procedures, prevailing throughout the country and approved by the overwhelming majority of courts," were not acting unreasonably under the Fourth Amendment in fulfilling their inventory and impounding procedures, which stem from their community caretaking function. Opperman, 428 U.S. 364, 376. Those procedures would have led to the discovery and inventory of defendant's firearms and ammunition after defendant's arrest, even if the officers had not cleared the firearms

and ammunition as a community caretaking procedure or as a protective sweep. Accordingly, the evidence should not be suppressed.

**IT IS THEREFORE ORDERED** that defendant's motion to suppress (Dkt. # 30) is **denied**.

**DATED** this 10th day of June, 2021.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE